NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-2913
_____

BERKS COUNTY,
Petitioner

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
Respondent

* Pennsylvania Department of Environmental Protection,
Intervenor


*(Pursuant to Clerk Order dated 08/05/14)
_____

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency
(EPA-R03-OAR-2013-0413)
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 14, 2015
_____

Before: AMBRO, VANASKIE, and SHWARTZ, *Circuit Judges*

(Filed: August 11, 2015)

———————

## OPINION[*]

———————

VANASKIE, *Circuit Judge.*

Sections 108 through 110 of the Clean Air Act (CAA), 42 U.S.C. §§ 7408–10, and implementing regulations promulgated by the United States Environmental Protection Agency (EPA), require states to identify and monitor "criteria pollutants," establish air quality standards with respect to those pollutants, and submit State Implementation Plans (SIPs) to EPA describing those efforts. Here, Petitioner Berks County challenges EPA's approval of the most recent SIP submitted by the Pennsylvania Department of Environmental Protection (DEP) with respect to the monitoring of airborne lead particles in the vicinity of Reading, Pennsylvania. For the reasons that follow, we will deny the petition for review.

### I.

A.     Statutory and Regulatory Framework

Section 108 of the CAA directs the Administrator of EPA to identify "criteria pollutants," which are those air pollutants the "emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare[.]" 42 U.S.C. § 7408(a)(1)(A). For each criteria pollutant, EPA is

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

required to establish primary and secondary National Ambient Air Quality Standards (NAAQS, or, if singular, Quality Standard), which set maximum acceptable concentrations of criteria pollutants in the outdoor air. *Id.* § 7409(b). EPA must establish primary NAAQS at a level "requisite to protect the public health[,]" *id.* § 7409(b)(1), while secondary NAAQS must be set at a level "requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air[,]" *id.* § 7409(b)(2). EPA must review and revise each Quality Standard every five years. *Id.* § 7409(d)(1). Within three years of EPA's promulgation of a new or updated NAAQS, each state must submit a SIP that provides for, among other things, the establishment of monitoring stations that can detect the levels of airborne criteria pollutants. *Id.* § 7410(a)(1)–(2); 40 C.F.R. §§ 58.2(a), 58.10(a)(1). This is consistent with the system created by the CAA, "under which the federal government develops baseline standards that the states individually implement and enforce." *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013).

The criteria pollutant at issue in this case is lead. *See* National Primary and Secondary Ambient Air Quality Standards for Lead, 43 Fed. Reg. 46,246 (Oct. 5, 1978). States must conduct ambient air monitoring for lead near "sources which are expected to or have been shown to contribute to a maximum [lead] concentration in ambient air in excess of the NAAQS, taking into account the logistics and potential for population exposure." Network Design Criteria for Ambient Air Quality Monitoring, 40 C.F.R. pt. 58, App. D, § 4.5(a). "At a minimum, there must be one source-oriented [monitoring]

3

site located to measure the maximum [lead] concentration in ambient air resulting from each non-airport [lead] source which emits 0.50 or more tons per year . . . ." *Id.*

Within one year of EPA's promulgation of a new or updated Quality Standard, each state must submit a list designating "nonattainment" areas, i.e., locations that do not meet the primary or secondary Quality Standard for a particular pollutant. 42 U.S.C. § 7407(d)(1)(A)(i). Within 18 months of such designation, states must submit a SIP that provides for attainment of the relevant NAAQS "as expeditiously as practicable but no later than 5 years from the date of the nonattainment designation[,]" *id.* § 7514a. *See id.* § 7514(a).

B.      Procedural Background

EPA finalized a revised Quality Standard for lead in 2008, reducing the acceptable level of lead in ambient air by 90%, from 1.5 $\mu g/m^3$ (micrograms per cubic meter) to 0.15 $\mu g/m^3$. National Ambient Air Quality Standards for Lead, 73 Fed. Reg. 66,964 (Nov. 12, 2008). Shortly thereafter, DEP observed that a state-run monitor (known as the Laureldale South monitor) in Berks County, near Reading, Pennsylvania, measured ambient air concentrations of lead at 0.38 $\mu g/m^3$, which violated the revised Quality Standard. The Laureldale South monitor was located near a secondary lead smelter (the Exide Facility) owned and operated by Exide Technologies, a facility known to emit more than one ton of lead per year.

In December 2009, after conducting a dispersion modeling study and site surveys, DEP recommended that the Exide Facility and its environs be designated a nonattainment

4

area for lead.  *See* Designation Recommendations For the 2008 Lead National Ambient Air Quality Standard, DEP (Dec. 2009), *available at* http://www.dep.state.pa.us/dep/ deputate/airwaste/aq/attain/leaddes/Final_Lead_NAAQS_DesignationRecs.pdf, at 12. Simultaneously, DEP installed a new, second lead monitor at a site within the nonattainment zone known as Laureldale North.  EPA approved the nonattainment designation in November 2010.  Air Quality Designations for the 2008 Lead (Pb) National Ambient Air Quality Standards, 75 Fed. Reg. 71,033, 71,043–44 (Nov. 22, 2010).

In September 2012, DEP submitted its SIP with respect to the revised 2008 lead NAAQS.  In July 2013, the EPA published notice of its intent to approve the SIP and invited comments on that proposed action.  Approval and Promulgation of Air Quality Implementation Plans, 78 Fed. Reg. 42,482 (July 16, 2013).  In August 2013, Petitioner submitted comments in opposition to the SIP, noting that in the 1980s, the owner of the Exide Facility had installed ambient air lead monitors around that Facility, three of which are located at a former convent called St. Mike's.  In 2010, the St. Mike's monitors recorded ambient air concentrations of lead several times higher than the levels detected by DEP's Laureldale South monitor.  Based on that evidence, Petitioner commented that the new state-run monitor should have been sited next to or in place of the St. Mike's monitors; that no good logistical reason existed to preclude such placement; and that DEP's 2009 modeling study failed to account for "fugitive emissions," i.e., lead released unintentionally from the Exide Facility.  Approval and Promulgation of Air Quality

5

Implementation Plans, 79 Fed. Reg. 19,009–11 (Apr. 7, 2014). In response, EPA noted that DEP's monitors had proven effective at identifying violations of the NAAQS for lead; that the locations of the monitors had been chosen by DEP based on valid logistical concerns, including costs and electrical requirements; and that because fugitive emissions are "difficult to quantify" and "do not travel far from the source[,]" DEP was justified in ignoring them. *Id.* at 19,011.

The EPA approved the SIP in a final rule effective May 7, 2014 (the Final Rule). *See id*. at 19,009–12. This appeal followed. We granted DEP's motion to intervene.

II.

We have jurisdiction to review a final EPA action that is "locally or regionally applicable" within our Circuit. 42 U.S.C. § 7607(b)(1).[1] When reviewing a final EPA action, we must "determine whether it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *GenOn REMA, LLC v. EPA*, 722 F.3d 513, 525 (3d Cir. 2013) (quoting 42 U.S.C. § 7607(d)(9)(A)). While this is a narrow and deferential standard of review, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), we must nevertheless ensure that EPA "examined the relevant data and articulated a satisfactory explanation for its action, including a rational

---

[1] EPA argues that Petitioner lacks standing to bring the instant action. Based on the content of Petitioner's Affidavit of Standing, however, we conclude that Petitioner has standing to challenge an agency action that threatens to diminish the aesthetic and recreational value of its property. *See, e.g.*, *Douglas Cnty. v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995).

connection between the facts found and the choice made." *Prometheus Radio Proj. v. FCC*, 373 F.3d 372, 389–90 (3d Cir. 2004) (citation and internal quotation marks omitted). Where EPA's decision is based on an interpretation of its own regulations, that interpretation is controlling "unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citation and internal quotation marks omitted). And we must be at our "'most deferential' when reviewing factual determinations within an agency's area of special expertise." *Sw. Pa. Growth Alliance v. Browner*, 121 F.3d 106, 117 (3d Cir. 1997) (quoting *New York v. EPA*, 852 F.2d 574, 580 (D.C. Cir. 1988)).

## III.

Petitioner's main argument is that EPA abused its discretion by approving DEP's placement of the Laureldale North monitor because its location was not properly situated to detect maximum lead concentrations in the vicinity of the Exide Facility. Petitioner suggests that DEP should have installed the monitor next to or in place of the St. Mike's monitors. Specifically, Petitioner claims that EPA ignored valid evidence from the St. Mike's monitors; that DEP's logistical concerns were not an appropriate basis upon which to approve the Laureldale North site; and that DEP failed to account for "fugitive emissions" when siting the monitor.

## A.

First, Petitioner argues that EPA was obligated to consider data from the St. Mike's monitors, which in Petitioner's view compelled the conclusion that the Laureldale

7

North monitor was not "located to measure the maximum [lead] concentration in ambient air." 40 C.F.R. pt. 58, App. D, § 4.5(a). EPA responds that it did consider the St. Mike's data, but that it reasonably afforded "limited weight" to such data because the St. Mike's monitors failed to comply with EPA's technical requirements for such devices set forth in 40 C.F.R. part 58, Appendices A, C, and E. Approval and Promulgation of Air Quality Implementation Plans, 79 Fed. Reg. at 19,010–11.

We agree that although the St. Mike's monitors may have assisted Exide Technologies in its internal efforts to comply with federal regulations, EPA itself is prohibited from using such data for most regulatory purposes, including for formal comparison of emissions data to the NAAQS at issue here. And to the extent that the data had any relevance in a purely supplemental capacity, we defer to EPA's technical determination that such data were not sufficient to outweigh DEP's stated reasons for siting the monitor at Laureldale North. *See Browner*, 121 F.3d at 117. Accordingly, the data from the St. Mike's monitors do not provide a basis on which to vacate EPA's approval of the SIP at issue here.

B.

Petitioner also contends that EPA placed undue emphasis on logistical factors in approving DEP's monitor placements. First, Petitioner concedes that "logistics" may be considered when siting monitors, *see* 40 C.F.R. pt. 58, App. D, §§ 3(b), 4.5, but argues that "costs" do not reasonably fall within the scope of that term. Second, Petitioner urges that the logistical difficulties cited by DEP here—such as inadequate electrical

8

infrastructure—were not sufficient to justify the placement of the Laureldale North monitor.

EPA's monitoring regulations do not define the term "logistics." Here, EPA interpreted the term to include "access, leasing agreements, accessibility to electricity, costs and worker safety." Approval and Promulgation of Air Quality Implementation Plans, 79 Fed. Reg. at 19,010. Because such practical considerations reasonably fall within the scope of the term "logistics" as it pertains to the placement of scientific field equipment, we conclude that EPA's interpretation of the applicable regulations was not "plainly erroneous or inconsistent with" the regulatory text. *Auer*, 519 U.S. at 461 (internal quotation marks omitted).

Further, the record reflects that in 2009, prior to the installation of the Laureldale North monitor, DEP conducted a dispersion modeling analysis to study levels of lead concentration in the ambient air around the Exide Facility. Within that area, DEP conducted further site surveys, taking into account population exposure, costs, and the availability of electricity. DEP concluded, and Petitioner does not appear to dispute, that the St. Mike's site lacked the electrical capacity to support an additional monitor. DEP further concluded that the costs of modifying the St. Mike's site to permit the installation of an additional monitor were prohibitive, and that other adequate sites existed from which to monitor lead emissions from the Exide Facility. EPA expressly cited all of these factors as relevant to its approval of the SIP at issue. Approval and Promulgation of Air Quality Implementation Plans, 79 Fed. Reg. at 19,010–19,011.

9

Because EPA "examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made," *Prometheus Radio*, 373 F.3d at 390 (internal quotation marks omitted), we conclude that the agency action here was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 42 U.S.C. § 7607(d)(9)(A). Accordingly, we will deny relief on this basis.

C.

Finally, Petitioner argues that DEP failed to account for fugitive emissions during its 2009 modeling study, and that the basis for its placement of the Laureldale North monitor is thus unreliable. Petitioner cites EPA's own guidance on the topic, which states that fugitive emissions from secondary lead smelters, such as the Exide Facility, "were the largest contributor to the risks due to lead emissions[,]" and that "[t]he impacts of fugitive emissions were generally considerably greater than the impacts due to stack emissions." National Emissions Standards for Hazardous Air Pollutants, 76 Fed. Reg. 29,032, 29,038 (proposed May 19, 2011). Petitioner also emphasizes EPA guidance stating that "[e]ach of the different emission types *must be considered* in the network design in order to ensure that monitors are located in maximum concentration areas . . . ." Guidance for Siting Ambient Air Monitors Around Stationary Lead Sources, EPA-454/R-92-009, § 4.2.2 (August 1997) (emphasis added).

In the Final Rule, EPA addressed Petitioner's comment regarding fugitive emissions as follows:

10

> EPA is aware that PADEP did not use fugitive emission sources in their 2009 modeling study of Exide prior to deployment of the Laureldale North monitors. However, fugitive emissions are extremely difficult to quantify, there is no standard way to do so, and inclusion in the modeling would have added to uncertainty already inherent in the model. Additionally, ground-level fugitive emissions do not travel far from the source and stay inside or very near the property fenceline.

Approval and Promulgation of Air Quality Implementation Plans, 79 Fed. Reg. at 19,011. In other words, EPA made a factual determination that the possibility of fugitive emissions was both challenging to assess quantitatively and unlikely to substantially improve DEP's placement of the new ambient air monitor if measured. This explanation is consistent with the 2011 Proposed Rule cited by Petitioner, which itself noted "the difficulties and uncertainties associated with estimating fugitive emissions." National Emissions Standards for Hazardous Air Pollutants, 76 Fed. Reg. at 29,038. Because EPA's conclusion on this point was based on a factual question falling squarely within EPA's area of expertise, and because the record shows that EPA evaluated the merits of Petitioner's position and rejected it after due consideration, we see no basis on which to grant relief. *Browner*, 121 F.3d at 117.

## IV.

For the aforementioned reasons, we will deny the petition for review.

11